UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYREE DYSHAWN BROOKS,

        Petitioner,

  v.

CATHLEEN STODDARD,

        Respondent.[1]

                       /

CASE NO. 1:11-CV-13675
JUDGE THOMAS L. LUDINGTON
MAGISTRATE JUDGE PAUL J. KOMIVES

## REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . 5
    C.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.    *Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            a. Claims III and IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            b. Claims V, VII, and IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        3.    *Exceptions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            a. Cause and Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            b. Actual Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    E.    *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    F.    *Right to Present Defense (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    G.    *Videotape (Claims III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        1.    *Confrontation (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        2.    *Failure to Preserve Video (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    H.    *Sentencing (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        1.    *Guideline Scoring* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        2.    *Inaccurate Information* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    I.    *Ineffective Assistance of Counsel (Claims V, VII-IX)* . . . . . . . . . . . . . . . . . . . . . . . . 41
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

[1]By Order entered this date, Cathleen Stoddard has been substituted in place of Jeffrey Woods as the proper respondent in this action.

          2.      *Trial Counsel (Claim V)* ............................................... 43
                  a. Gunshot Residue Test ................................................ 43
                  b. Self-Defense Witness ................................................ 44
          3.      *Appellate Counsel (Claims VII-IX)* ..................................... 45
                  a. Substitute Counsel ................................................. 45
                  b. Failure to Raise Claims ............................................. 49
                  c. Failure to Provide Transcript ........................................ 50
  J.      *Recommendation Regarding Certificate of Appealability* ........................... 52
          1.      *Legal Standard* ....................................................... 52
          2.      *Analysis* ............................................................ 53
  K.      *Conclusion* ............................................................ 54
III.        <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u> ...................................... 54

*     *     *     *     *

I.     <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     <u>REPORT</u>:

A.     *Procedural History*

     1.       Petitioner Tyree Dyshawn Brooks is a state prisoner, currently confined at the Carson City Correctional Facility in Carson City, Michigan.

     2.       On March 20, 2006, petitioner pleaded guilty to felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, in the Washtenaw County Circuit Court. Two days later, on March 22, 2006, petitioner was convicted of second degree murder, MICH. COMP. LAWS § 750.317, following a jury trial. On April 27, 2006, petitioner was sentenced as a second habitual offender, MICH. COMP. LAWS § 769.10, to a term of 40-60 years' imprisonment.

     3.       Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims relating to his murder conviction:

     I.       DEFENDANT-APPELLANT IS ENTITLED TO A NEW TRIAL WHERE THERE WAS INSUFFICIENT EVIDENCE FOR THE CONVICTION OF SECOND DEGREE MURDER OR ALTERNATIVELY, THE MOTION

2

FOR DIRECTED VERDICT SHOULD HAVE BEEN GRANTED.

II.    DEFENDANT-APPELLANT IS ENTITLED TO A NEW TRIAL WHERE THE TRIAL COURT DENIED DEFENDANT HIS RIGHT TO PRESENT A DEFENSE WHEN THE COURT EXCLUDED EVIDENCE DIRECTLY RELATED TO DEFENDANT'S MENS REA AT THE TIME OF THE OFFENSE.

Petitioner filed a supplemental *pro per* brief, raising the following additional claims:

I.    DEFENDANT-APPELLANT'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHERE THE PROSECUTION FAILED TO PROCURE AND PRESERVE A VIDEOTAPE THAT MAY HAVE SHOWN EXCULPATORY EVIDENCE, VIOLATING DEFENDANT-APPELLANT'S DUE PROCESS RIGHT TO CONFRONTATION. CONST AMEND XIV; CONST 1963, ART 1, § 20.

II.    THE APPELLANT CONTENDS THAT FUNDAMENTAL DUE PROCESS, BOTH SUBSTANTIVE AND PROCEDURAL VIOLATION DEMAND THAT HE BE RESENTENCED, DUE TO THE INACCURATE INFORMATION USED IN HIS ORIGINAL SENTENCE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Brooks*, No. 271412, 2008 WL 2938549 (Mich. Ct. App. July 31, 2008) (per curiam).

4.    Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Brooks*, 483 Mich. 851, 759 N.W.2d 23 (2009).

5.    On June 23, 2009,, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.    DEFENDANT IS ENTITLED TO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE FROM A RES GESTAE WITNESS WHO WAS ON THE PROSECUTION'S WITNESS LIST, WHO DEFENDANT DID NOT WAIVE AT TRIAL, AND WHO DID NOT TESTIFY THAT THE DECEASED IN THIS CASE WAS THE AGGRESSOR, AND WHO ESTABLISHES DEFENDANT'S CLAIM OF SELF-DEFENSE (OR REASONABLE PROVOCATION NECESSARY FOR MANSLAUGHTER) SUCH THAT IT IS MORE LIKELY THAN NOT THAT NO

REASONABLY JUROR WOULD HAVE CONVICTED HIM IN LIGHT OF THE EVIDENCE PRESENTED.  ALTERNATIVELY, DEFENDANT ASSERTS THAT TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE, INTERVIEW WITNESSES, AND OBJECT TO THE PROSECUTION'S NON-PRODUCTION OF MR. FAIRLEY, OR REQUEST POLICE ASSISTANCE IN TRYING TO LOCATE HIM.

II.    DEFENDANT WAS DENIED HS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY HIS TRIAL ATTORNEY'S FAILURE TO HAVE THE VICTIM'S CLOTHING TESTED FOR GUNSHOT RESIDUE.

III.   THE TRIAL COURT ERRED REVERSIBLY AND DENIED DEFENDANT HIS FUNDAMENTAL RIGHT TO COUNSEL IN FAILING TO ADEQUATELY INQUIRE INTO DEFENDANT'S REQUEST FOR SUBSTITUTE COUNSEL ON APPEAL AS OF RIGHT.

IV.    APPELLATE COUNSEL'S REFUSAL TO PROVIDE THE INDIGENT DEFENDANT WITH A COPY OF THE TRIAL TRANSCRIPTS UNTIL AFTER IT WAS TOO LATE FOR DEFENDANT TO FILE AN ADEQUATE AND EFFECTIVE STANDARD 4 BRIEF ON APPEAL, OPERATED TO DEPRIVE DEFENDANT OF HIS RIGHT TO DUE PROCESS AND EQUAL PROTECTION OF THE LAW.

V.     DEFENDANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE FROM HIS APPELLATE COUNSEL DANIEL J. RUST WHO FRUSTRATED DEFENDANT'S APPEAL, AND OMITTED SIGNIFICANT AND OBVIOUS ISSUES ON APPEAL.  THEREFORE, DEFENDANT IS ENTITLED TO A NEW APPEAL OF RIGHT, OR A NEW TRIAL, OR AN EVIDENTIARY HEARING.

On September 17, 2009, the trial court denied petitioner's motion for relief from judgment, concluding that petitioner could not show good cause for his failure to raise the claims on direct appeal or actual prejudice, as required by MICH. CT. R. 6.508(D)(3).  The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders.  *See People v. Brooks*, 489 Mich. 971, 798 N.W.2d 772 (2011); *People v. Brooks*, No. 299317 (Mich. Ct. App. June 28, 2011).

6.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

4

on August 23, 2011, raising the following claims: (1) insufficient evidence; (2) denial of right to present a defense; (3) denial of confrontation; (4) destruction of exculpatory evidence; (5) ineffective assistance of trial counsel for failing to (a) have the victim's clothing tested for gunshot residue, and (b) investigate potential self-defense witnesses; (6) inaccurate information at sentencing; (7) denial of substitute counsel; (8) ineffective assistance of appellate counsel; (9) failure of appellate counsel to provide transcripts.

7.      On January 19, 2009, petitioner filed a motion to stay the case so that he could return to state court and file a second motion for relief from judgment. The Court granted in the motion on September 5, 2012. On October 9, 2012, petitioner filed a second motion for relief from judgment in the trial court, alleging newly discovered evidence. On November 15, 2012, the trial court denied the motion as a prohibited successive motion barred by MICH. CT. R. 6.502(G)(1). Petitioner subsequently moved to reopen his habeas petition to assert the claims raised in his original petition. The Court granted the motion on December 18, 2012.

8.      Respondent filed her answer on March 15, 2013. She contends that petitioner's third through fifth, seventh, and ninth claims are barred by petitioner's procedural default in the state courts. She also contends that each of petitioner's claims is without merit.

9.      Petitioner filed a reply to respondent's answer on April 10, 2013.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the September 4, 2005, shooting death of Daniel Hamilton in Ypsilanti, Michigan. The evidence adduced at trial was briefly summarized by the Michigan Court of Appeals:

> Defendant's conviction arises out of facts occurring in Ypsilanti in 2005. In the early morning hours of September [4], defendant stood outside MJ's bar, with a

crowd of 15 to 20 people. At some point, the victim left the bar to make a call on his cellular telephone. After he completed the call, the victim found himself surrounded by defendant and several of defendant's friends. One of the men hit the victim, and the victim fought back. At another point, the victim and defendant "squared up," facing each other, raising their fists, and prepared to fight. The bar's bouncer pulled the victim back inside, and told defendant and his friends to go home. As the bar closed, the crowd finally dispersed, and the bar owner escorted the victim to his car.

Less than an hour later, defendant, the victim and the victim's friend, Lewis Fairley, met in the 600 block of Armstrong Street. The victim and Fairley removed their shirts. The victim and defendant argued, and then defendant shot a firearm at the victim. The first shot missed its intended target (the victim), and pierced the windshield of a parked car. Defendant resumed firing, and the next three shots hit the victim, first in the leg, which fractured two of his bones, then in the hip, and finally in the back, puncturing his heart. Defendant fled the crime scene, and the victim died. Later that morning, Fairley invaded the homes of several of defendant's relatives, looking for defendant, who had fled the state.

*Brooks*, 2008 WL 2938549, at *1. The facts are more fully summarized in the prosecutor's brief to

the Michigan Court of Appeals on direct appeal:

At about 9:00 or 9:30 on the night of September 3, 2005, Hamilton went into MJ's Bar (formerly the Wooden Nickel) in Ypsilanti. It was the bar's policy not to admit anyone after 1:00 a.m., so when Defendant, a longtime friend of Hamilton's, attempted to enter after that time, he was turned away. Defendant and a number of other people were loitering in the parking lot, and the bar's owner and bouncer asked them to clear out. Defendant did not comply with the request.

That night, Officer Diana Good of the Eastern Michigan University police had received a report of two black males acting suspiciously near a car parked on the north part of campus. As she canvassed the area, she noticed two men standing in line outside MJ's who appeared to match the description of the suspects. At about 1:21 a.m., she approached the men, one of whom happened to be Defendant. When Officer Good began speaking with him, Defendant appeared "pretty agitated" and swore at her several times, calling her a "bitch" and using other vulgar language. For her safety, Officer Good radioed for backup.

Officers Jill Kulhanek and Annette Coppock of the Ypsilanti Police Department heard Officer Good's request over the radio. Officer Coppock could hear Defendant "yelling over the radio giving [Officer Good] a hard time." Coppock recognized the voice as Defendant's. Both officers drove to the bar; when they arrived, Defendant was yelling at Officer Good. Officer Kulhanek described his demeanor as "[b]elligerent and agitated," and Officer Coppock testified that Defendant "was being verbally combative" and was "very loud and yelling." The Ypsilanti officers confirmed Defendant's identity for Officer Good. Neither Kulhanek nor Coppock observed any weapons in Defendant's possession at that

time.

The officers determined that Defendant was not the person whose suspicious activity had been reported, and Defendant eventually apologized to Officer Good, explaining that, because of his "reputation on the streets," he did not want others to see him cooperating with the police.

Much of this action (though without the sound) was recorded by one of the bar's surveillance cameras. The video (which was later viewed by Detective Deric Gress of the Ypsilanti police) also depicted the victim, Daniel Hamilton, exiting the bar at 1:38 a.m. and flipping open his cellular phone. At 1:41 a.m., after being out of the camera's view for a couple of minutes, Hamilton was trying to make his way back into the bar when Defendant and four or five of his companions (including one Demetrius Hudson, or "Duke") confronted Hamilton, attempted to grab him, removed Hamilton's button-down shirt, and tried to get him to fight. At about 1:48, Defendant and Hamilton went into the parking lot and raised their fists, as if squaring off to fight. Defendant's companions then began to surround Hamilton, who backed up and "was trying to make sure he could account for everybody that was starting to surround him." Defendant then backed away, went around Hamilton, and confronted him near the door of the bar. A bouncer then grabbed Hamilton and took him inside the bar.

At this point, according to the bouncer's testimony, everyone outside was "hyper" and "riled up." The crowd was divided into two groups, who began "trash talking" with each other; Defendant participated in this verbal exchange. The bouncer was running back and forth, trying to keep everyone calm before anything erupted. He had to go up to Defendant a few times to try to calm him down–about once every four or five minutes. The bouncer told Defendant (whose demeanor he described as "hyper") to leave the property about five or six times, but Defendant refused to comply.

Hamilton was not involved in these exchanges; the bar staff made sure that he stayed inside the bar. The bouncer did not see any physical altercation that night between Hamilton and Defendant, nor did he see Defendant with a weapon that night. Eventually the bar staff escorted Hamilton and his companions out a back door. As a precaution, the bar's owner walked them out to their car. Hamilton did not say anything at this time; he simply got into his car with two or three other individuals. After a while, everyone else left as well.

Brenda Roberts ("Brenda"), who had known Hamilton since childhood, had called him at about 10:00 or 11:00 p.m. to ask what he was doing that night. Hamilton told Brenda he was about to go to MJ's and invited her to join him. Brenda declined on the ground that MJ's was an 18-and-older establishment; instead, she went to Ypsilanti Elks Club with her cousin, Lonzo Roberts ("Lonzo"). At about 2:40 a.m., Brenda again called Hamilton, who this time invited her to the 600 block of Armstrong Drive, also known as "the projects." Although initially reluctant, Brenda finally agreed out of a desire to see Hamilton, who had called her frequently the day before. Brenda continued speaking with Hamilton on the phone as she drove to the projects. She "heard a lot of commotion going on in the background."

Hamilton sounded drunk but not angry; he was teasing her for "always bulling." Brenda told him she was on her way and hung up the phone; at this point she was driving over a railroad track.

During the early morning hours of September 4, 2005, witness Richele Osborne had driven to the projects to pick up a friend. She saw a rather large crowd–at least 20 people–when she parked her car on the side of Armstrong Drive. Osborne was sitting in the car, waiting for her friend, when she saw Defendant and Hamilton (both of whom she had known for years) arguing nearby. Both men appeared angry. But while Defendant was yelling at Hamilton, the victim was "[k]ind of brushing him off"–he was "not really arguing back, but kind of walking away." Hamilton did not make any movements toward Defendant as he walked away, nor did he make any motions with his hands. Hamilton appeared to be "[n]ot worried about it . . . he was like he wasn't nobody to him. He didn't care about what he was saying really."

Osborne then saw Defendant shoot a gun into the air or in Hamilton's direction. Osborne saw a flash come out of the front of the gun as he fired; she did not see anyone besides Defendant with a gun. Defendant then pointed his gun toward Hamilton and shot him in the leg; Hamilton's leg bent and he stumbled. As Hamilton tried to run away, Defendant fired a third shot; Osborne believed that this shot hit Hamilton in the back, since she saw his back bend backwards. Hamilton continued to flee after sustaining the wound, ending up by a house or apartment building on the other side of the road. After he fell to the ground, Osborne saw Defendant run away. Osborne then left the scene. She did not report the shooting to the police; rather, someone else gave the police her name, and they contacted her the next day. Osborne had to be subpoenaed to appear in court.

Brenda Roberts testified that, as she was nearing Armstrong Drive, "a car came flying out," narrowly missing her vehicle. As she was pulling onto the road, she noticed that her phone indicated that Hamilton was on the line; either his phone was calling hers or vice versa. But when she opened up her phone to talk, no one was there. Brenda continued driving on Armstrong, and as she turned the corner, she saw a large crowd of people. Some of them were moving very fast, while others were standing right in the middle of the street and moving back very slowly. Brenda slowed down, and as she turned the corner, her headlights began to shine on the people standing in the middle of the road, causing them to move out of the way quickly. Brenda turned into the first parking lot, and she and Lonzo parked their cars and got out.

In less than two minutes, two people ran over to them and told them that Hamilton had been shot. Brenda could not believe this news, since she had just gotten off the phone with him; only about three to five minutes had passed between the time she had hung up the phone as she crossed the railroad tracks and the time she arrived at the parking lot.

Brenda and Lonzo immediately ran over to where Hamilton was said to be; they found Hamilton lying by himself with a crowd of people standing around him in a circle. Lonzo lifted up Hamilton's shirt and found no bullet wounds in his front;

he then rolled Hamilton over, saw a wound in his back, and immediately placed his hand on the wound to stop the bleeding. The police arrived about 10 to 15 minutes later, and the ambulance about two to five minutes after that. Brenda and Lonzo did not see Demetrius Hudson at the projects that night, but they did see Lewis Fairley (also known as "Killis") and Michael Kyle there. Both Fairly and Kyle seemed very upset. Lonzo described Kyle, who was "best friends" with Hamilton, as "hysterical"; he was crying and "just really going crazy."

Ypsilanti police officers had responded to a report of shots fired on Armstrong Drive. When Officer Coppock pulled up, there were about 100 people gathered at the scene. Hamilton was lying on the ground near the rear door of 667 Armstrong; Lonzo was kneeling beside him. Fairley was crying, and Kyle was even more upset: yelling, jumping up and down, stomping around, and ripping down the yellow police tape. The officers had to move him away from Hamilton more than once. When the fire department and ambulance personnel arrived, some in the crowd were yelling at them and objecting to the way they were handling Hamilton. After the ambulance left, Officer Coppock spoke with Kyle, but he refused to tell her what he knew about the incident. Initially, Fairley was willing to provide such information, but he then changed his mind and said he was leaving. Officer Coppock spoke with several other people in the crowd, but none would provide information about the shooting. Hamilton eventually died from the gunshot wounds.

Police took photographs and canvassed the area for possible evidence; they found no shell casings. There was a trail of blood beginning in the area where the initial shots were fired and ending behind the address of 677 Armstrong–approximately 80 feet long. The police found no gun powder on the victim's clothing, indicating that "the gun firing the bullets was a significant distance away from him." According to Detective Sergeant Robert Rayer, an expert in the field of firearms identification, the type of bullets used and the fact that no cartridge cases were recovered at the scene were consistent with the use of a revolver. In order to fire four shots with a revolver, one would have to pull back and release the trigger four times.

A couple of days after the shooting, Defendant's mother, Vanessa Brooks, learned that Defendant had gone to Illinois to see his cousin. On September 6, Defendant turned himself in to the Ypsilanti police.

The medical examiner, Dr. Bader Cassin, determined that the manner of death was homicide caused by multiple gunshot wounds. Hamilton sustained three gunshots: a shot to the lower front left leg, which exited just above the ankle; a shot to the side of the left hip, which did not exit; and a shot to the left mid-back, which went through the spleen and the top of the stomach, penetrated the right ventricular area of the heart (causing massive acute bleeding), and came to rest in the diaphragm. The first shot shattered the bone in Hamilton's lower left leg. Dr. Cassin found no evidence that any of the shots was fired at close range (i.e., within two feet). Each of the shots struck Hamilton at a different angle. Dr. Cassin testified that the wounds were consistent with a scenario in which Hamilton initially faced the shooter, then turned to his right, and finally had his back to the shooter.

>Dr. Cassin also performed a toxicology screen, which indicated that alcohol, an inactive cocaine metabolite, and the drug commonly known as "Ecstasy" were in Hamilton's blood at the time of death. He could not say at what time the drugs had been consumed, although the cocaine probably entered the body within six hours before death. Hamilton would have been under the influence of alcohol at the time of death, but Dr. Cassin could not say whether he was under the influence of other drugs.

Pl.-Appellee's Br. on Appeal, in *People v. Brooks*, No. 271412 (Mich. Ct. App.), at 1-8 (footnotes and citations to trial transcript omitted); *see also*, Def.-Appellant's Br. on Appeal, at 2-7.

C.      *Procedural Default*

Respondent contends that review of petitioner's third through fifth, seventh, and ninth claims are barred by petitioner's procedural default in the state courts. Specifically, respondent contends that petitioner's third and fourth claims, relating to the videotape, are barred because petitioner failed to object at trial, and that petitioner's fifth, seventh, and ninth claims are barred because petitioner failed to raise these claims on direct appeal. The Court should agree.

1.      *Legal Standard*

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984));

10

*see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default."). If a claim is procedurally defaulted, a habeas court may not review the claim unless the petitioner establishes cause for, and prejudice attributable, to the default, or that failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750.

    2.    *Default*

*a. Claims III and IV*

Respondent contends that petitioner's third and fourth claims are barred by petitioner's procedural default because he failed to challenge the officer's testimony regarding the videotape and the police failure to preserve the tape at trial. The Court should agree. On direct appeal, the Michigan Court of Appeals found that petitioner's third claim was not preserved in the trial court, and it therefore reviewed this claim only for plain error. *See Brooks*, 2008 WL 2938549, at *4. This state procedural rule, commonly known as the contemporaneous objection rule, was firmly established and regularly followed at the time of petitioner's trial. *See, e.g.*, *People v. Duncan*, 402 Mich. 1, 15-16, 260 N.W.2d 58, 61-62 (1977); *People v. Curry*, 175 Mich. App. 33, 39, 437 N.W.2d 310, 314 (1989). As the state court clearly and expressly relied on this state procedural rule with respect to petitioner's third claim, this claim is barred absent a showing of either cause and prejudice or a fundamental miscarriage of justice. *See Engle v. Isaac*, 456 U.S. 107, 125-129 (1982) (state contemporaneous objection rule is adequate procedural bar precluding consideration of habeas claims). Further, this conclusion is not altered by the fact that the Michigan Court of Appeals did consider the merits of petitioner's claim. It is clear that the court of appeals did so only in the

context of determining whether petitioner could establish plain error to overcome his procedural default. "[P]lain error review by the state court does not constitute a waiver of procedural default rules." *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *see also*, *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

With respect to petitioner's fourth claim, the court of appeals concluded that petitioner had failed to "properly brief this argument," and thus that the claim "was abandoned." *Brooks*, 2008 WL 2938549, at *5. This abandonment rule was firmly established and regularly followed at the time of petitioner's appeal, and is adequate to constitute a procedural default. *See Marchbanks v. Jones*, No. 1:06-CV-269, 2009 WL 1874191, at *2 (W.D. Mich. June 26, 2009) (discussing *People v. Watson*, 245 Mich. App. 572, 587, 629 N.W.2d 411, 421-22 (2001)). Accordingly, the Court should conclude that petitioner's fourth claim is procedurally defaulted.

### b. Claims V, VII, and IX

Likewise, the Court should conclude that petitioner has procedurally defaulted his fifth, seventh, and ninth claims. These claims were raised for the first time in petitioner's motion for relief from judgment in the trial court. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not, unless the defendant establishes good cause and actual prejudice. *See* MICH. CT. R. 6.508(D)(1)-(3). Both the Michigan Court of Appeals and the Michigan Supreme Court rejected

12

petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." The Sixth Circuit has held that the form orders used by the Michigan courts constitute unexplained orders which are ambiguous as to whether a procedural bar is being invoked, and thus a federal habeas court must "look through" these orders to the last reasoned state court judgment to determine if the claims are barred. *See Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc). Here, the trial court clearly invoked Rule 6.508(D)(3) in rejecting petitioner's claims. *See* Hr'g Tr., dated 9/17/09, at 4, 6-7. Thus, the trial court clearly and expressly relied on the procedural bar set forth in Rule 6.508(D)(3) in rejecting petitioner's claim. There is no question that Rule 6.508(D)(3) was firmly established and regularly followed at the time of petitioner's default. Thus, petitioner's fifth, seventh, and ninth claims are procedurally defaulted.

      3.     *Exceptions*

### a. Cause and Prejudice

Because each of the claims discussed above is procedurally defaulted, review of these claims is barred unless petitioner is able to meet one of the two exceptions to the procedural default rule. The first exception requires petitioner to demonstrate cause for, and prejudice attributable to, his default. *See Coleman*, 501 U.S. at 750; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). The Court should conclude that he cannot show cause for his procedural default.

To establish "cause," petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also*, *Coleman*, 501 U.S. at 753. With respect to his third and fourth claims, petitioner asserts no grounds as cause to excuse his procedural default. His failure to "advance any argument in support of a finding of cause" with respect to these claims renders his "cause . . . argument abandoned."

13

*Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003). With respect to his fifth, seventh, and ninth claims, petitioner contends that appellate counsel was ineffective for failing to raise these claims on his direct appeal. As the Supreme Court has observed, "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to establish cause. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). In order to constitute cause, however, counsel's performance must amount to ineffective assistance of counsel under the Sixth Amendment. *See id.* As discussed below, *see infra* part I.3, petitioner cannot show that appellate counsel was ineffective for failing to raise these claims on direct appeal. He therefore cannot rely on counsel's ineffectiveness to establish cause for his procedural default.

Because petitioner must establish both cause and prejudice, his failure to establish cause makes it unnecessary to consider the prejudice issue. *See Hargrave-Thomas v. Yukins*, 374 F.3d 383, 389 (6th Cir. 2004); *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004). Nevertheless, as noted below even if petitioner could establish cause, he cannot establish prejudice because his claims are without merit. *See Nunn v. Yukins*, No. 98-2309, 2000 WL 145378, at *1 (6th Cir. Feb. 4, 2000) (no prejudice where defaulted claims were meritless); *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994) (same); *Alvarez v. Straub*, 64 F. Supp. 2d 686, 696 (E.D. Mich. 1999) (Rosen, J., adopting Report & Recommendation of Komives, M.J.) (same).

### b. Actual Innocence

Under the second exception, known as the "fundamental miscarriage of justice" exception, petitioner can still have his procedurally barred claims reviewed if he can show that the constitutional errors he alleges "'ha[ve] probably resulted in the conviction of one who is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Murray*, 477 U.S. at 496);

*accord Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). In order to be entitled to the actual innocence exception, however, a petitioner must present "new and reliable evidence that was not presented at trial" that "show[s] that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 299 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327 (internal citation and quotation omitted); *see also*, *Bousley*, 523 U.S. at 623. It is not sufficient to show merely that the evidence raises a reasonable doubt which did not otherwise exist. *See Schlup*, 513 U.S. at 329 ("The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."). "Examples of evidence which may establish factual innocence include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence"). *See generally*, *Souter*, 395 F.3d at 589-90. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Thus, to establish the actual innocence exception "petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). In short, "the *Schlup* standard is demanding," *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1936 (2013), with the result that "tenable actual-innocence gateway pleas are rare." *Id*. at 1928.

Here, petitioner has pointed to no new, reliable evidence of the type identified in *Schlup* that

shows he is actually innocent.  Attached to petitioner's habeas application is the affidavit of Lewis Fairley.  Fairley avers that Hamilton pulled a gun on petitioner, upon which he and Michael Kyle approached the two.  Petitioner then pulled out a gun, followed by Kyle pulling out his own gun. Kyle began to shoot at petitioner, at which point Fairley ran away.  When he returned after the shooting, he retrieved Hamilton's gun and threw it into the grass.  *See* Aff. of Lewis Fairley, ¶¶ 5-12. This affidavit is insufficient to establish petitioner's actual innocence for purposes of overcoming his procedural default.  Despite knowing of the incident and speaking with police at the scene of the shooting, Fairley failed to come forward with his version of events, either to the police or to petitioner and his attorney at the time of trial.  Fairley, rather, waited several years to come forward with his affidavit.  New statements from witnesses years after the crime are inherently suspect, *see Schlup*, 513 U.S. at 331, and such statements are to be viewed with "a degree of skepticism." *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring); *see also*, *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (citing *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 508 n. 16 (6th Cir. 2000).  There is nothing to explain why Fairley remained silent during this time.  *See Lewis v. Smith*, 110 Fed. Appx. 351, 355 (6th Cir. 2004) (proper for district court to reject as suspicious a witness' recanting affidavit made two years after petitioner's trial); *Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993) (recantation more than four years after trial testimony was dubious).  Further, according to the Michigan Department of Corrections's Offender Tracking Information System (OTIS) website, Fairly is currently serving a sentence of 20-40 years' imprisonment.  *See* <<http://mdocweb.state.mi.us/otis2/otis2profile.aspx?

16

mdocNumber=297836>>.[2]   Fairley's long term of imprisonment reduces the threat of criminal penalty or other sanction which would attach to his statement to render it credible. *Cf. In re Byrd*, 269 F.3d 561, 574 (6th Cir. 2001). Finally, Fairley's affidavit is wholly inconsistent with the other evidence presented at trial. No other witness testified that either Hamilton or Kyle had a weapon, much less that Kyle was the first to fire. No evidence of gunfire other than the shots fired by petitioner was recovered. For these reasons, petitioner has failed to present the type of new, reliable evidence sufficient to demonstrate that he is actually innocent.

D.   *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

---

[2]Pursuant to FED. R. EVID. 201(c), the Court may take judicial notice of the information provided on OTIS. *See Daly v. Burt*, 613 F. Supp. 2d 916, 920 n.2 (E.D. Mich. 2009) (Murphy, J.); *Ward v. Wolfenbarger*, 323 F. Supp. 2d 818, 821 n. 3 (E.D. Mich. 2004) (Tarnow, J.).

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility

18

for fairminded disagreement." *Id*. at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412). The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v.*

*Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

Although a number of petitioner's claims are procedurally defaulted, the AEDPA standard of review nonetheless applies to each of petitioner's claims. With respect to petitioner's third claim, the Michigan Court of Appeals considered this claim on the merits in determining whether petitioner could establish plain error. *See Brooks*, 2008 WL 2938549, at *4. With respect to petitioner's fourth claim, although the court of appeals found that his claim had been abandoned, in the context of discussing petitioner's third claim the court also discussed, and rejected, petitioner's argument that the prosecution deprived him of due process by failing to preserve the video evidence, which is the basis of the petitioner's fourth claim. In doing so, the court of appeals applied the legal standard applicable to this type of claim. *Compare Brooks*, 2008 WL 2938549, at *4 (discussing legal standard established in *Arizona v. Youngblood*, 488 U.S. 51 (1988)), *with infra*, part G.2.a (discussing clearly established law applicable to petitioner's fourth claim). Finally, with respect to petitioner's fifth, seventh, and ninth claims, the trial court alternatively rejected each of these claims on the merits. *See* Hr'g Tr., dated 9/17/09, at 5-6. The Sixth Circuit has "squarely endorsed the view that 'a federal constitutional claim reviewed by a state court for "plain error" can be considered "adjudicated on the merits" for the purpose of receiving deference under AEDPA.'" *Bond v. McQuiggan*, 506 Fed. Appx. 493, 498 n.2 (6th Cir. Nov. 29, 2012) (quoting *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009)). Further, where a state court addresses the merits as an alternative ground for decision notwithstanding its application of a procedural bar, the alternative merits adjudication is considered "on the merits" for purposes of § 2254(d) and is entitled to deference under the AEDPA. *See Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008); *see also, Rolan v.*

*Coleman*, 680 F.3d 311, 319-20 (3d Cir. 2012) (citing cases). Thus, to the extent the Court considers the claims on the merits, the AEDPA standard of review set forth in § 2254(d) applies to petitioner's defaulted claims.

E.      *Sufficiency of the Evidence (Claim I)*

In his first claim, petitioner contends that the prosecution presented insufficient evidence to prove his guilt of second degree murder beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam). The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). Likewise, a reviewing court "do[es] not make

credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. The prosecution may establish the elements of a crime through circumstantial evidence that creates a reasonable inference that an element is satisfied. *See Kelly v. Jackson*, 353 F. Supp.2d. 887, 891 (E.D. Mich. 2005) (citing *People. v. Goecke*, 457 Mich. 442, 463-64, 579 N.W.2d 868 (1998)). As the Supreme Court has explained:

> Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Holland v. United States*, 348 U.S. 121, 140 (1954).

As the Court has explained, "the only question under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. Under the amended version of § 2254(d)(1) a federal habeas court's review is "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). A state court's decision that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference under AEDPA." *Coleman*, 132 S. Ct. at 2065; *see also*, *Cavazos*, 132 S. Ct. at 4.

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense

22

that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 132 S. Ct. at 2064 (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16). Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. Second degree murder consists of four elements: (1) a death; (2) caused by an act of the defendant; (3) with malice; and (4) without lawful justification or excuse. *See People v. Smith*, 478 Mich. 64, 70, 731 N.W.2d 411, 414-15 (2007) (citing *People v. Goecke*, 457 Mich. 442, 464, 579 N.W.2d 868 (1998)). "Some evidence must be presented regarding each element of the crime or from which those elements may be inferred." *People v. Goecke*, 457 Mich. 442, 470, 579 N.W.2d 868 (1998) (citing *People v. Doss*, 406 Mich. 90, 100-01, 276 N.W.2d 9 (1979)). In order to show malice, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). The malice element of second degree murder may be inferred from the circumstances of the death. *See People v. Werner*, 254 Mich. App. 528, 531, 659 N.W.2d 688, 692 (2002); *People v. Mackey*, 168 Mich. App. 154, 157, 423 N.W.2d 604, 606 (1988).

     2.    *Analysis*

Petitioner contends that the evidence was insufficient to prove beyond a reasonable doubt that he acted with malice aforethought.  The Michigan Court of Appeals rejected this claim, reasoning:

> Defendant shot a loaded gun (a dangerous weapon) four times directly at the victim. After defendant's first accurate shot, which fractured two of the victim's leg bones, defendant either knew or should have known that if he fired the gun at the victim again, he was likely to cause a risk of great bodily harm or death to the victim.  Thus, we find there was sufficient evidence of malice.

*Brooks*, 2008 WL 2938549, at *2.  This determination was reasonable.  Although there was testimony that petitioner's first shot was fired into the air, and one of the shots did not hit the victim but struck a windshield, the primary witness to the shooting testified that petitioner pointed his gun at the victim and fired several times at the him, "an act from which the jury could infer that petitioner intended to kill [Hamilton], commit great bodily harm, or create a high risk of death or great bodily harm."  *Times v. Woods*, No. 12-15550, 2013 WL 5488449, at *16 (E.D. Mich. Oct. 2, 2013) (Friedman, J., adopting Report of Komives, M.J.) (citing *People v. Fields*, No. 266738, 2007 WL 1712619, at *1 (Mich. Ct. App. June 14, 2007) ("Shooting a gun at a person at such close range clearly indicates an obvious disregard of life-endangering consequences."); *People v. Williams*, No. 232827, 2004 WL 2124705, at *5 (Mich. Ct. App. Sept. 23, 2004) ("Because the natural tendency of firing a gun at a door behind which someone is standing is to cause death or great bodily harm, there was evidence from which a rational factfinder could find beyond a reasonable doubt that defendant acted with malice.")); *see also*, *Holman v. Cason*, No. 04-CV-60087, 2006 WL 1195826, at *6 (E.D. Mich. May 3, 2006) (Battani, J.) (citing *People v. Carines*, 460 Mich. 750, 759, 597 N.W.2d 130, 136 (1999)) ("[A] rational trier of fact could have inferred malice from the fact that the victim was shot with a deadly weapon.").

24

Petitioner also argues that the evidence was insufficient because the evidence established, at most, that he committed manslaughter. Under Michigan law "[m]anslaughter is murder without malice." *People v. Mendoza*, 468 Mich. 527, 534, 664 N.W.2d 685, 689 (2003). "Murder and manslaughter are both homicides and share the element of being intentional killings. However, the element of provocation . . . characterizes the offense of manslaughter [and] separates it from murder." *People v. Pouncey*, 437 Mich. 382, 388, 471 N.W.2d 346, 350 (1991). Thus, "[u]nder Michigan law, 'voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation, and before a reasonable time has passed for the blood to cool and reason to resume its habitual control.'" *Todd v. Stegal*, 40 Fed. Appx. 25, 29 (6th Cir. 2002) (quoting *People v. Fortson*, 202 Mich. App. 13, 19, 507 N.W.2d 763, 767 (1993)). In other words, "to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Mendoza*, 468 Mich. at 535-36, 664 N.W.2d at 690.

Not every form of provocation, however, will suffice to negate the malice necessary for murder. As the Michigan Supreme Court has explained,

> [t]he provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. . . .
> In addition, the provocation must be adequate, namely, that which would cause the reasonable person to lose control. Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter. The law cannot countenance the loss of self-control; rather, it must encourage people to control their passions.

*Pouncey*, 437 Mich. at 389, 471 N.W.2d at 350; *see also*, *People v. Sullivan*, 231 Mich. App. 510, 518, 586 N.W.2d 578, 582 (1998). As to the second factor, "the provocation must be adequate,

25

namely, that which would cause the reasonable person to lose control.  Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter." *Pouncey*, 437 Mich. at 389, 471 N.W.2d at 350; *see also*, *People v. Sullivan*, 231 Mich. App. 510, 518, 586 N.W.2d 578, 582 (1998).  Importantly, "[t]he determination of what is reasonable provocation is a question of fact for the fact finder." *Pouncey*, 437 Mich. at 390, 471 N.W.2d at 350.

Here, the Michigan Court of Appeals rejected petitioner's claim, explaining:

> We also find that there was sufficient evidence that defendant's malice was not mitigated by adequate provocation, leading to a heat-of-passion killing.  By the account of every witness, defendant was the aggressor.  He first sought to fight the victim at the bar.  When defendant and the victim argued immediately before the murder, defendant was the aggressor, and the victim tried to "brush him off." Finally, it was defendant who gravely escalated the situation, by brandishing and intentionally discharging a firearm directly at the victim.

*Brooks*, 2008 WL 2938549, at *2.  This determination was reasonable.  There was evidence presented that petitioner initiated both the confrontation at the bar, and at the apartment complex where the shooting occurred.  There was further evidence that the confrontation involved only an exchange of words until petitioner fired at the victim.  A verbal exchange alone is "not usually sufficient to constitute adequate provocation." *People v. Roper*, 286 Mich. App. 77, 88, 777 N.W.2d 483, 492 (2009); *see also*, *Pouncey*, 437 Mich. at 391, 471 N.W.2d at 351.  Further, there was evidence presented that the victim was shot as he attempted to flee.  This evidence supports a finding that petitioner had an adequate opportunity for his passions to cool and to consider his actions.  *See Sherman v. Howes*, No. 1:06-cv-369, 2009 WL 4250763, at *13 (W.D. Mich. Nov. 24, 2009).  It is irrelevant to this determination that the evidence might also have supported an inference that petitioner acted under adequate provocation; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient.  *See Jackson*, 443 U.S. at 326.

26

As noted above, the *Jackson* standard does not permit "fine-grained factual parsing" of the evidence by a reviewing court, *Coleman*, 132 S. Ct. at 2064, nor does it permit this Court to reweigh the conflicts in the evidence or assess the credibility of the witnesses. The jury, as the finder of fact, was free to draw any reasonable inferences from the evidence, and to resolve the conflicts in the evidence in favor of the prosecution. In light of the testimony at trial, the verdict was not "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. It therefore follows that the Michigan Court of Appeals's rejection of this claim was reasonable, and accordingly the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Right to Present Defense (Claim II)*

Petitioner next contends that he was denied his right to present a defense by the exclusion of evidence. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law. Implicit in these provisions is the right to present a meaningful defense. As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Further, the Court

27

has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408. Although the right to present a defense is fundamental, it is not absolute. Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Further, to constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308. A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court).

2.    *Analysis*

Petitioner contends that he was denied his right to present a defense because the trial court excluded, on relevance grounds, evidence that he had suffered a beating a few months prior to the shooting, and again a few days before the shooting. Petitioner argues that this evidence was relevant

to show that he was adequately provoked, and that he felt he was in imminent danger sufficient to justify the use of deadly force in self-defense. The Michigan Court of Appeals rejected this claim, concluding that because petitioner "did not assert that the victim was the person who assaulted him[,] evidence of the assaults was not relevant or admissible to prove adequate provocation or that defendant honestly and reasonably believed he was in imminent danger of death or great bodily harm and that it was necessary for him to exercise deadly force." *Brooks*, 2008 WL 2938549, at *3. This determination was reasonable. With respect to manslaughter, as explained above the provocation must be adequate to cause a reasonable person to be unable to control his passions, and there must not be a lapse of time in which his passions could have cooled. *See Mendoza*, 468 Mich. at 535-36, 664 N.W.2d at 690. The fact that petitioner had been the victim of assaults at the hands of someone other than the victim several days and several weeks before he shot the victim provides no relevant evidence for assessing whether the victim's conduct at the time of the shooting was adequate to provoke a reasonable person in using deadly force. *Cf. State v. Patterson*, 63 So. 2d 140, 151 (La. Ct. App. 2011) (robbery of defendant by victim weeks before shooting did not constitute adequate provocation); *Commonwealth v. Colon*, 866 N.E.2d 412, 426 (Mass. 2007) ("Only incidents immediately preceding the shooting can constitute reasonable provocation."); *People v. White*, 590 N.E.2d 236, 238 (N.Y. 1992) (repeated humiliation of defendant by victim weeks before murder insufficient to constitute adequate provocation).

Nor would this evidence have been relevant to petitioner's claim of self-defense. Self-defense is available under Michigan law only if the defendant honestly and reasonably believes both (1) that he is in imminent danger of death or great bodily harm, and (2) that it is necessary for him to exercise deadly force. *See People v. Riddle*, 467 Mich. 116, 119, 649 N.W.2d 30, 34 (2002). As

29

the Michigan Supreme Court explained in *Riddle*, "[t]he necessity element of self-defense normally requires that the actor try to avoid the use of deadly force if he can safely and reasonably do so, for example by applying nondeadly force or by utilizing an obvious and safe avenue of retreat." *Riddle*, 467 Mich. at 119, 649 N.W.2d at 34 (2002). Here, even if the evidence of the prior assaults on petitioner by someone else was relevant to show that he honestly believed himself to be in imminent danger of death or great bodily harm, it could not have shown that he reasonably believed this to be the case. *See People v. Hatchett*, No. 249195, 2004 WL 2535240, at *1 (Mich. Ct. App. Nov. 9, 2004) (per curiam) (although "an argument could be made that defendant 'honestly' believed that his life was in imminent danger or that he was about to receive serious bodily harm[,] . . . since defendant never saw Anthony with a gun, Anthony never attacked defendant, and defendant fired the gun three more times after Anthony began to run away, we conclude that defendant did not have a 'reasonable' belief that his life was in imminent danger or that he was about to receive serious bodily harm."); *cf. People v. Sims*, 638 N.E.2d 223, 229 (Ill. Ct. App. 1994) (evidence of assault that "did not involve the victim and occurred five months prior to the shooting" not relevant to defendant's self-defense claim). *See generally*, *People v. Campbell*, No. 255256, 2005 WL 1189669, at *2 (Mich. Ct. App. May 19, 2005) (per curiam) (citations omitted) ("An honest belief of imminent danger is insufficient. The reasonableness of the belief is determined by an objective standard."). Moreover, regardless of the honesty or reasonableness of petitioner's belief, there was absolutely no evidence to show necessity. On the evidence presented at trial, at the time of the shooting the victim was unarmed, was not engaged in a physical altercation with petitioner, was some distance from petitioner, and was turning away. Under these facts there was no necessity in petitioner's use of deadly force, as he easily could have turned away and retreated. *See Hatchett*,

2004 WL 2535240, at *2.  In short, because these prior assaults could not have demonstrated that petitioner acted with adequate provocation, or that he had a reasonable belief that the use of deadly force was necessary, the exclusion of this evidence did not "infringe upon a weighty interest of" petitioner, *Scheffer*, 523 U.S. at 308, by excluding evidence that, evaluated in the context of the entire record, would have "'create[d] a reasonable doubt that did not otherwise exist.'"  *Blackwell*, 459 F.3d at 753 (quoting *Washington*, 255 F.3d at 47).  Thus, the Michigan Court of Appeals's rejection of this claim was reasonable, and petitioner is not entitled to habeas relief.[3]

G.   *Videotape (Claims III & IV)*

Petitioner next raises two claims relating to the absence of a videotape of the incident outside MJ's prior to the shooting.  At trial, Detective Deric Gress testified that after the shooting he went to MJ's, viewed the bar's recording of the earlier confrontation, and took notes regarding the viewing.  He testified to the contents of the video at trial, based on his notes.  *See* Trial Tr., Vol. II, at 51-52.  The video was destroyed shortly thereafter, however, and thus the video itself was not available for viewing.  Prior to trial the parties discussed, and during trial the owner of MJ's Michael Argiero testified to, the circumstances leading to the loss of the video, as summarized by the prosecution in its brief to the Michigan Court of Appeals:

MJ's Bar had received its liquor licence on November 1, 2004, and initially

---

[3]In the state courts, petitioner also argued that he was denied his right to present a defense by the exclusion of evidence that Fairley had, after the shooting, illegally entered the homes of petitioner's relatives searching for petitioner.  Petitioner does not assert this argument in his brief in support of the petition or in his reply brief.  To the extent petitioner is asserting this claim here, it is clearly meritless. As the Michigan Court of Appeals explained, evidence of actions taken by Fairley in the days following the shooting could have provided no relevant evidence as to whether petitioner adequately provoked petitioner or whether petitioner had an honest and reasonable belief that the use of deadly force against the victim was necessary at the time of the shooting.  *See Brooks*, 2008 WL 2938549, at *3.  Thus, the exclusion of this evidence did not "infringe upon a weighty interest of" petitioner.  *Scheffer*, 523 U.S. at 308.

it used an analog video surveillance system.  Six months later, however, the bar's owner, Michael Argiero, decided to switch to a digital surveillance system.  Although Argiero was not very computer savvy, "everybody seemed to think that's the way to go so [he] said all right let's do it."  During the summer of 2005, the bar was making the transition from analog to digital.  Argiero knew little about the workings of the digital system, including the process of making copies.

When Ypsilanti police asked for a CD or memory card containing a copy of the relevant footage, the bar management told them they would immediately contact their computer technician.  When the bar attempted to download the relevant footage, however, they found that it had been overwritten.  The police bought a new memory card for the computer, but to no avail.  The police then obtained and executed a search warrant on the computer system, but even the Homeland Security officers they contacted were unable to uncover the relevant video.  The system's memory apparently was inadequate for the large number of cameras the bar had employed; consequently, the system automatically recorded over previous footage, including the video relevant to this case.

Pl.-Appellee's Br. on Appeal, in *People v. Brooks*, No. 271412 (Mich. Ct. App.), at 22-23 (footnotes and citations to trial transcript omitted); *see also*, Trial Tr., Vol. I, at 20-24, 192-94, 199-200.

Petitioner contends that he was denied his right to confront the witnesses by Detective Gress's testimony concerning the contents of the video, and that he was denied his right to due process by the destruction of the video.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Confrontation (Claim III)*

Petitioner first contends that he was denied his right to confront the witnesses when Detective Gress was permitted to testify regarding what he observed on the video.  The Michigan Court of Appeals rejected this claim, explaining that petitioner "cross-examined the officer who testified about the contents of the video," and that the video itself "was not a witness against him" that petitioner had a right to cross-examine.  *Brooks*, 2008 WL 2938549, at *5.  Because this determination was reasonable, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

32

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. By its terms the Confrontation Clause "applies to 'witnesses' against the accused–in other words, those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Gress, the witness who testified at trial regarding the contents of the videotape, was clearly a "witness" whom petitioner had a Sixth Amendment right to cross-examine. That right, however, was fully afforded to petitioner. The video of the incident, on the other hand, was in no sense a "witness" that bore testimony against petitioner. Thus, so long as Gress was subject to cross-examination, as he was, he was free under the Confrontation Clause to testify to what he observed on the video. *See Church v. Schriro*, No. CV-07-1236, 2008 WL 2168998, at *21 (D. Ariz. May 22, 2008); *State v. Schmidt*, 817 N.W.2d 332, 339 (N.D. 2012); *State v. Thorne*, 618 S.E.2d 790, 794 (N.C. Ct. App. 2005); *cf. United States v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008) ("the witnesses with whom the Confrontation Clause is concerned are *human* witnesses[.]"). At a minimum petitioner has cited, and I have found, no clearly established Supreme Court case which suggests that a Confrontation Clause violation arises when a witness subject to cross-examination testifies regarding the contents of video he has viewed, and thus petitioner cannot show that the Michigan Court of Appeals's rejection of this claim was unreasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his confrontation claim.

2.     *Failure to Preserve Video (Claim IV)*

Petitioner also contends that he was denied his right to due process of law by the failure of the police to preserve the video. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

*a. Clearly Established Law*

The Due Process Clause requires the state to disclose exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, in order to establish a *Brady* claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Petitioner bears the burden of establishing each of these three elements. *See Carter*, 218 F.3d at 601. Further, although *Brady* requires disclosure of exculpatory evidence, it is well established, that "*Brady* . . . does not require the government to create exculpatory material that does not exist." *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980); *see also*, *Richards v. Solem*, 693 F.2d 760, 766 (8th Cir. 1982) ("Although the state has a duty to disclose evidence, it does not have a duty to create evidence.").

The *Brady* rule extends to evidence which is not suppressed, but is lost or destroyed. *See California v. Trombetta*, 467 U.S. 479, 489 (1984). This rule, however, applies only to material exculpatory evidence, that is, evidence which "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. at 488-89.

34

However, "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). In a case involving potentially useful evidence, the defendant must "show bad faith on the part of the police." *Id*.; *see also*, *Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (per curiam). As the Sixth Circuit has explained, *Trombetta* and *Youngblood* establish "[s]eparate tests . . . to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, versus cases where 'potentially useful' evidence is not accessible." *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001).

Where the *Youngblood* bad faith requirement applies, "[t]he presence or absence of bad faith by the [government] for the purposes of the Due Process Clause must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id*. at 56 n.*. Thus, "where the government is negligent, even grossly negligent, in failing to preserve potential exculpatory evidence, the bad faith requirement is not satisfied." *Wright*, 260 F.3d at 571; *see also*, *United States v. Garza*, 435 F.3d 73, 75 (1st Cir. 2006). Further, the requirement that a defendant show bad faith is not eliminated by the existence of a pending discovery request for the evidence, *see Fisher*, 540 U.S. at 548, nor does it depend on "the centrality of the contested evidence to the prosecution's case or the defendant's defense[.]" *Id*. at 549.

*b. Analysis*

By all accounts, the confrontation outside MJ's was a verbal altercation between petitioner, the victim, and several others, that did not evolve into a physical altercation and at which no

35

participant brandished a weapon.  Nothing on the video had an apparent exculpatory value.  This being the case, the court of appeals was correct in concluding that petitioner would be entitled to relief only if the police acted in bad faith.  *See Youngblood*, 488 U.S. at 58.  And as the court of appeals noted, there was no evidence that the police failed to preserve the evidence as a result of bad faith:

> The record shows that police officers made every effort to preserve the video data. They requested the video data immediately after viewing it.  After they learned that the bar owner did not know how to use his equipment, and that the information had been inadvertently replaced by new video data, officers secured a search warrant, and submitted the computer to the federal Department of Homeland Security for further analysis.  There was no evidence that they acted in bad faith, destroyed the evidence, or neglected to secure it.

*Brooks*, 2008 WL 2938549, at *4.  Petitioner has pointed to no "independent evidence that the [police were] somehow improperly motivated," *United States v. Gallant*, 25 F.3d 36, 39 n.2 (1st Cir. 1994), or that the police "made a conscious effort to harm him or violate his rights."  *United States v. Seibert*, 148 F. Supp. 2d 559, 571 (E.D. Pa. 2001) (citing *Trombetta*, 467 U.S. at 488 ("The record contains no allegation of official animus toward respondents or of a conscious effort to suppress exculpatory evidence.").  Indeed, the record fails to show that *Youngblood* is implicated at all. Because the Due Process Clause regulates only government actors, not private persons, a defendant can be denied due process by the loss or destruction of evidence only where he shows that the "loss is chargeable to the State."  *United States v. Rahman*, 189 F.3d 88, 139 (2d Cir. 1999) (internal quotation omitted).  Here, the record contains no evidence that the police were responsible for the loss of the video; the video in question was "not recorded at the Government's request or instruction. There is no indication that Government agents made any request or instruction to destroy any of the [video]."  *Id*. at 140.  Accordingly, the Court should conclude that petitioner is not entitled to habeas

relief on this claim.[4]

H.      *Sentencing (Claim VI)*

Petitioner next claims that the trial court erred in scoring the sentencing guidelines.  The

Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Guideline Scoring*

Petitioner contends that the trial court erred in scoring Offense Variable 6 (OV-6) at 25

points.  A habeas petitioner's claim that the trial court violated state law when sentencing him is not

cognizable in habeas corpus proceedings.  *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir.

1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987).  Federal habeas courts have no authority

to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness

in the trial process.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan*

*Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Petitioner's claim that the court

improperly scored or departed from the guidelines range raises issues of state law that are not

cognizable on habeas review.  *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999)

(Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an

---

[4]I note that even if the *Youngblood* bad faith standard were not applicable to this claim, petitioner is still not entitled to habeas relief.  As explained above, to prevail on a loss of evidence claim where the bad faith standard does not apply, petitioner must still show that the lost evidence was material exculpatory evidence, that is, evidence which "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488-89.  Here, the video of the confrontation outside the bar does not meet this standard.  First, the confrontation provided scant exculpatory evidence.  As explained above in connection with petitioner's exclusion of evidence claim, what happened outside the bar was of limited relevance to whether the victim adequately provoked petitioner much later at the apartment complex.  Further, there is nothing in the record to indicate that the victim's actions at the bar provided adequate provocation.  Finally, petitioner had other "reasonably available means" for presenting this evidence, through the direct testimony of witnesses who were at the bar.

issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review).  Thus, petitioner is not entitled to habeas relief on his claims relating to the trial court's scoring of, or departure from, the Michigan sentencing guidelines.

In any event, petitioner cannot show any error in the scoring of OV-6.  This offense variable provides, in relevant part, that the court should score 25 points if "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result."  MICH. COMP. LAWS § 777.36(1)(b).  Notwithstanding this provision, however, the court should only "[s]core 10 points if a killing is intentional within the definition of second degree murder or voluntary manslaughter, but the death occurred in a combative situation or in response to victimization of the offender by the decedent."  *Id.* § 777.36(2)(b).  Petitioner contends that the evidence showed that the killing occurred in a combative situation, and thus that only 10 points should have been scored on OV-6.  The evidence presented a trial showed that, although the victim and petitioner were arguing with one another, they were not engaged in a physical altercation at the time petitioner shot the victim.  The trial court could therefore properly conclude that the death did not occur in a combative situation.  *See People v. Miller*, No. 281466, 2009 WL 416813, at *3 (Mich. Ct. App. Feb. 19, 2009) (per curiam) (OV-6 properly scored at 25 points where "[t]he only 'combat' that took place was verbal in nature."); *People v. Jackson*, No.192120, 1997 WL 33353216, at *1 (Mich. Ct. App. Apr. 4, 1997) (per curiam) ("Here, there was evidence to support the court's conclusion that a combative situation did not exist where defendant approached the unarmed victim, the two men had words and

when the victim turned to walk away, defendant fatally shot him. Since the evidence indicates that the victim was not 'inclined to fight,' a combative situation did not exist[.]"); *cf. Koras v. Robinson*, 123 Fed. Appx. 207, 214 (6th Cir. 2005) (appellate counsel not ineffective for failing to raise claim that petitioner should have been assessed only 10 points under OV-6 where there was "no significant evidence in the record that Koras and the victim were engaged in a physical fight[.]").  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Inaccurate Information*

Petitioner also contends that his sentence was improper because the trial court's scoring of OV-6 was based on inaccurate information.  This claim is without merit.  In *Townsend v. Burke*, 334 U.S. 736 (1948), and *United States v. Tucker*, 404 U.S. 443 (1972), "the United States Supreme Court invalidated defendants' sentences because they were imposed by trial courts in reliance upon material false assumptions of fact."  *Eutzy v. Dugger*, 746 F. Supp. 1492, 1504 (N.D. Fla. 1989) (discussing *Townsend* and *Tucker*); *accord Stewart v. Peters*, 878 F. Supp. 1139, 1144 (N.D. Ill. 1995) (same).  *See generally*, *Tucker*, 404 U.S. at 448-49; *Townsend*, 334 U.S. at 740-41.  It is well established, however, that a *Tucker* violation arises only where the improper information  "actually served as the basis for the sentence."  *United States v. Jones*, 40 Fed. Appx. 15, 17 (6th Cir. 2002) (internal quotation omitted); *see also*, *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003); *United States v. Johnson*, 767 F.2d 1259, 1276 (8th Cir. 1985).  "A sentencing court demonstrates reliance on misinformation when the court gives 'explicit attention' to it, 'found[s]' its sentence 'at least in part' on it, or gives 'specific consideration' to the information before imposing sentence."  *Lechner*, 341 F.3d at 639 (quoting *Tucker*, 404 U.S. at 444, 447).  Thus, to be entitled to habeas relief on this claim  petitioner "must show that the sentencing court actually relied on this information and that

it was materially false." *Hanks v. Jackson*, 123 F. Supp. 2d 1061, 1074 (E.D. Mich. 2000) (Gadola, J.).

With respect to OV-6, petitioner's challenge is not to the accuracy of the information relied upon by the trial court. Rather, he contends that the facts relied upon by the trial court were insufficient as a legal matter to support the trial court's scoring of that variable. He contends that the facts adduced at trial constituted a "combative situation" under OV-6 as a matter of law. As noted above, the legal sufficiency of the facts to support the scoring of an offense variable is a question of state law which is not cognizable on habeas review. *See Norton v. Lafler*, No. 08-12797, 2010 WL 5672743 (Apr. 19, 2010) (Komives, M.J.), *magistrate judge's report adopted*, 2011 WL 318099, at *2 (E.D. Mich. Jan. 31, 2011) (Hood, J.); *Southward v. Warren*, No. 2:08-CV-10398, 2009 WL 6040728, at *19 (July 24, 2009) (Komives, M.J.), *magistrate judge's report adopted*, 2010 WL 733035, at *2 (E.D. Mich. Feb. 26, 2010) (Steeh, J.). At best, petitioner's argument boils down to a dispute over the trial court's resolution of factual questions. However, this is insufficient to establish that he was sentenced on the basis of material false information in violation of his right to due process under *Townsend* and *Tucker*. As the Court made clear in *Townsend*, an alleged error by the trial court in resolving a disputed factual question at sentencing does not constitute reliance on materially false information:

> Nor do we mean that mere error in resolving a question of fact on a plea of guilty by an uncounseled defendant in a non-capital case would necessarily indicate a want of due process of law. Fair prosecutors and conscientious judges sometimes are misinformed or draw inferences from conflicting evidence with which we would not agree. But even an erroneous judgment, based on a scrupulous and diligent search for truth, may be due process of law.

*Townsend*, 334 U.S. at 741. "Thus, what is essential is that the sentencing judge decide upon the sentence after being made aware of all exculpatory evidence and of the defendant's version of the

story." *United States v. Von Saltzer*, 532 F. Supp. 584, 586 (D. Nev. 1982). Here petitioner, through counsel, objected to the scoring of OV-6 and presented his version of the facts. *See* Sentence Tr., at 14. The trial judge, based on the information available, drew inferences from the facts and made factual findings. While petitioner disputes those findings, he has offered nothing to show that they were materially false. Thus, he has failed to establish a due process violation under *Townsend*, and the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.      *Ineffective Assistance of Counsel (Claims V, VII-IX)*

Petitioner next raises several claims that his trial and appellate attorneys were constitutionally ineffective. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See*

*id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common

42

custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

### 2.   *Trial Counsel (Claim V)*

Petitioner contends that trial counsel was ineffective for failing to have the victim's clothing tested for gunshot residue, and for failing to investigate a potential self-defense witness. The Court should conclude that these claims are without merit.

### *a.  Gunshot Residue Test*

Petitioner contends that trial counsel should have sought testing of the victim's clothing to support his claim of self-defense. The trial court rejected this claim for the reasons stated by the prosecution in its response to petitioner's motion for relief from judgment. *See* Hr'g Tr., dated 9/17/09, at 5. The trial court's rejection of this claim was reasonable. There was absolutely no evidence presented at trial that Hamilton possessed, let alone fired, a gun during the verbal confrontation between him and petitioner. Indeed, even under petitioner's current version of events as reflected in Fairley's affidavit, it was Kyle, not the victim, who pulled out a gun and fired the first shot. Because there is absolutely no evidence to suggest that Hamilton ever fired a gun, petitioner cannot show that counsel performed deficiently by failing to request such a test. Indeed, counsel could have reasonably concluded that such a test would have harmed rather than helped petitioner,

43

because a negative result could have foreclosed any attempt to argue self-defense. *See Logmans v. Moore*, No. 02-5622, 2005 WL 1106336, at *16 (D.N.J. Apr. 29, 2005); *Russell v. Campbell*, No. 1:04CV67260, 2005 WL 3406330, at *8 (E.D. Cal. Dec. 12, 2005); *cf. Satcher v. Pruett*, 126 F.3d 561, 573 (4th Cir. 1997) (counsel's failure to seek independent DNA testing to challenge prosecution's test not deficient performance where there was equal chance that results of test could have helped or harmed petitioner, and testing would have undermined counsel's reasonable defense strategy). Nor can petitioner show that he was prejudiced by counsel's decision. Because there is no evidence to suggest that Hamilton ever fired a gun, and petitioner's current version of events does not even allege that Hamilton fired a gun, there is not a reasonably probability that the result of the proceeding would have been different had counsel sought gunshot residue testing of the victim's clothing. Thus, the trial court's rejection of this claim was reasonable.

### b. Self-Defense Witness

Petitioner also contends that counsel was ineffective for failing to interview Fairley, who now avers that petitioner acted in self-defense. Counsel's strategic decisions regarding what witnesses to call at trial are "virtually unchallengeable." *Awkal v. Mitchell*, 613 F.3d 629, 641 (6th Cir. 2010). The Court's "concern is not to decide, using hindsight, what [it] think[s] would have been the *best* approach at trial. Instead, [the Court] consider[s] only if the approach ultimately taken was within 'the wide range of reasonable professional assistance' given the circumstances." *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010) (quoting *Strickland*, 466 U.S. at 689). As the Supreme Court explained in *Strickland*, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-91. Thus, where counsel

44

reasonably determines that further investigation "would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. Here, the information available to counsel at the time suggested that any investigation aimed at securing Fairley's testimony would have been fruitless. It is undisputed that Fairley was a friend of the victim, and that he was severely distraught by the shooting. Indeed, petitioner desired to present evidence that Fairley committed several home invasions looking for petitioner in order to exact revenge on him. In these circumstances, counsel had no reason to believe that Fairley would have been willing to provide any information helpful to petitioner. Thus, counsel's decision not to pursue this line of investigation cannot be deemed unreasonable, and petitioner is therefore not entitled to habeas relief on this claim.

### 3. *Appellate Counsel (Claims VII-IX)*

Petitioner next raises several challenges relating to his appellate counsel. Specifically, he contends that the trial court erred in failing to inquire into his request for substitute appellate counsel, that counsel was ineffective for failing to raise various claims on appeal, and that counsel was ineffective for failing to provide him with copies of the trial transcript.

### a. *Substitute Counsel*

Petitioner first contends that the trial court improperly failed to inquire into his request for substitute counsel on appeal. As an initial matter, it is doubtful that petitioner could show that any decision on a motion to substitute appellate counsel was contrary to, or an unreasonable application of, clearly established law entitling him to relief under § 2254(d)(1). Although, as will be discussed shortly, the Supreme Court has set forth standards guiding requests for substitution of trial counsel under the Sixth Amendment, the Supreme Court has made clear that the Sixth Amendment right to

45

counsel is a trial right that does not extend to appeal. Rather, any right to counsel on appeal derives from the Due Process Clause of the Fourteenth Amendment. *See Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 160-61 (2000). And no Supreme Court decision has provided any guidance whatsoever on the scope of an indigent defendant's right under the Due Process Clause to substitute appellate counsel. Thus, the denial of substitute counsel on appeal does not run afoul of any clearly established federal law as determined by the Supreme Court. *Cf. Tamalini v. Stewart*, 249 F.3d 895, 902 (9th Cir. 2001) (although Supreme Court has recognized a qualified Sixth Amendment right to counsel of one's choice, it has not recognized a similar right on appeal under the Due Process Clause, and because the Supreme Court has made clear that the Sixth Amendment is inapplicable to appeals "the decision of the Washington Court of Appeals to appoint new counsel over Tamalini's Sixth Amendment objection was not contrary to, nor did it involve an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States."). In any event, petitioner is not entitled to relief even if the Court were to apply the Sixth Amendment standard to petitioner's claim.

The Sixth Amendment right to counsel contemplates a corollary right to the counsel of one's choice, and thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). However, "[a]lthough the Sixth Amendment contemplates a right to counsel of choice, that right is generally cognizable only to the extent defendant can retain counsel with private funds; an indigent defendant does not have an absolute right to choose appointed counsel." *Haynie v. Furlong*, No. 98-1177, 1999 WL 80144, at *1 (10th Cir. Feb. 17, 1999). As

46

the Supreme Court has recently explained, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). Further, the right to counsel of one's choice is not absolute, and "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Importantly, the right to counsel of one's choice "must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988); *see also*, *Lockett v. Arn*, 740 F.2d 407, 413 (6th Cir. 1984) ("Although a criminal defendant is entitled to a reasonable opportunity to obtain counsel of his choice, the exercise of that right must be balanced against the court's authority to control its docket."). Further, as the Supreme Court has explained, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Id*. (quoting *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984). Because an indigent defendant has no absolute right to appointed counsel of his choice, and because the focus of the Sixth Amendment inquiry is on effective advocacy, "[a] criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991); *accord United States v. Blaze*, 143 F.3d 585, 593 (10th Cir. 1998); *United States v. Iles*, 906 F.2d

47

1122, 1130 (6th Cir. 1990).

Here, petitioner failed to establish good cause for substitution of counsel, "such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Smith*, 923 F.2d at 1320. Petitioner does not allege that there was any irreconcilable conflict between himself and counsel, or that counsel was acting with a conflict of interest. While petitioner does contend that there was a breakdown in communication, he does not allege the type of complete breakdown for which substitute counsel is warranted. Rather, petitioner contends only that counsel was unprepared and had not presented various motions which he thought should be brought. This is insufficient to constitute the type of complete breakdown justifying appointment of substitute counsel. *See United States v. Carillo*, 161 Fed. Appx. 790, 793 (10th Cir. 2006); *cf. Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) (there is no constitutional right to a "meaningful attorney-client relationship."). Further, the state court was not required to appoint substitute counsel merely because petitioner disagreed with the claims counsel chose to raise on appeal. *See Beatty v. Caruso*, 64 Fed. Appx. 945, 951 n.6 (6th Cir. 2003).

Further, even assuming that the trial court erred by not granting petitioner's request for substitute appellate counsel, petitioner's claim fails because any error was harmless. As noted above, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably by represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, the courts that have considered the issue have concluded that "[u]nless [a defendant] can establish an ineffective assistance claim under *Strickland v. Washington* . . . any error in the [trial] court's disposition of [the defendant's] motion for appointment of substitute counsel is harmless." *United States v. Graham*, 91 F.3d 213, 217 (D.C.

Cir. 1996) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)); *see also*, *United States v. Calderon*, 127 F.2d 1314, 1343 (11th Cir. 1997); *United States v. Zillges*, 978 F.2d 369, 372-73 (7th Cir. 1992); *Bowie v. Renico*, No. 00-10013, 2002 WL 31749162, at *11 (E.D. Mich. Nov. 6, 2002) (Lawson, J.); *Stephens v. Costello*, 55 F. Supp. 2d 163, 172 (W.D.N.Y. 1999). As the Supreme Court has explained, "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Because, as explained below, petitioner was not deprived of the effective assistance of appellate counsel, he has "no cognizable complaint."[5] Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Failure to Raise Claims

Petitioner next contends that appellate counsel was ineffective for failing to raise on direct appeal the claims that he raised in his motion for relief from judgment. This claim is without merit.

---

[5]This conclusion is not altered by the Supreme Court's decision in *United States v. Gonzalez-Lopez*, *supra*. In that case, the Court held that a defendant who has been denied his Sixth Amendment right to counsel of his choice need not demonstrate that his actual trial attorney was defective, or that he was prejudiced by counsel's deficient performance. *See Gonzalez-Lopez*, 548 U.S. at 146. Further, the Court held that a denial of the right to counsel of one's choice is a structural error, and thus harmless error review does not apply to such a denial. *See id.* at 150-51. *Gonzalez-Lopez* is inapplicable here. That case involved a defendant who had retained counsel to represent him but was denied the right to have his retained counsel appear on his behalf. Nothing in that decision purported to alter the rules applicable to an indigent defendant's right to appointed counsel of his choice. On the contrary, the Court explicitly reaffirmed the *Wheat* and *Caplin & Drysdale* conclusions that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.* at 151 (citing *Caplin & Drysdale*, 491 U.S. at 624; *Wheat*, 486 U.S. at 159). Thus, *Gonzales-Lopez* does not call into question the Court's prior observation that "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale*, 491 U.S. at 624; *see Harlan v. Lafler*, No. 2:09-CV-14524, 2011 WL 6131091, at *7 (E.D. Mich. Dec. 8, 2011) (Borman, J.); *Johnson v. Balcarcel*, No. 07-12783, 2009 WL 5171812, at *2 n.2, *8 (E.D. Mich. Dec. 22, 2009) (Duggan, J., adopting report of Komives, M.J.); *Garcia v. Quarterman*, No. H-06-0504, 2006 WL 2413714, at *14 (S.D. Tex. Aug. 18, 2006).

With respect to appellate counsel, it is well established that "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Although it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Id*. As a general rule, it is "'only when ignored issues are clearly stronger than those presented [that] the presumption of effective assistance of counsel [can] be overcome.'" *Id*. (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Further, in the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See id*. at 285-86; *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Here, petitioner cannot show that counsel was ineffective. Counsel raised significant claims on direct appeal, and as explained above each of petitioner's claims is without merit. Thus, petitioner cannot show that any of the omitted claims were clearly stronger than the claims counsel chose to pursue. Nor, for the same reason, can petitioner establish prejudice by showing a reasonable probability that the omitted claims would have succeeded on appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Provide Transcript

Finally, petitioner contends that counsel was ineffective for failing to timely provide him copies of his transcripts so that he could file an effective *pro per* supplemental brief in the Michigan Court of Appeals. As a factual matter, this claim is without merit, because petitioner in fact filed a *pro per* supplemental brief on appeal, and the Michigan Court of Appeals considered each of

petitioner's claims.  In any event, petitioner cannot show that counsel was ineffective for failing to assist him in filing his *pro per* supplemental brief by providing him copies of the trial transcripts. Even if state law required such assistance, nothing in the Constitution does so.  "Because representation by counsel and self-representation are mutually exclusive entitlements, the assertion of one right constitutes a *de facto* waiver of the other."  *United States v. Traeger*, 289 F.3d 461, 475 (7th Cir. 2002).  Thus, there is no constitutional right to "hybrid" representation, where a defendant is both represented by counsel and acts as his own attorney.  *See Wilson v. Hurt*, 29 Fed. Appx. 324, 327 (6th Cir. 2002); *United States v. Olano*, 62 F.3d 1180, 1193 (9th Cir. 1995).  For this reason, "[a]bsent invocation of his right to represent himself without the assistance of counsel," a petitioner is "not entitled to have his *pro se* motions entertained by the court alongside those of counsel." *Delgado v. Duncan*, No. 02-CV-4929, 2003 WL 23185682, at *5 (E.D.N.Y. Nov. 4, 2003); *see also*, *Abdullah v. United States*, 240 F.3d 683, 686 (8th Cir. 2001); *United States v. Bergman*, 813 F.2d 1027, 1030 (9th Cir. 1987); *United States v. Gallardo*, 915 F. Supp. 216, 217 (D. Nev. 1995), *aff'd*, 92 F.3d 1194 (9th Cir. 1996); *Hall v. Dorsey*, 534 F. Supp. 507, 509 (E.D. Pa. 1982).  The same rule holds true for *pro se* appellate filings.  *See Myers v. Johnson*, 76 F.3d 1330, 1335 (5th Cir. 1995) (a criminal defendant has no constitutional right to hybrid representation on appeal, and when defendant accepts assistance of counsel, but later objects to his attorney's appeal strategy or preparation of brief, defendant cannot then expect to be allowed to file supplemental *pro se* briefs on direct appeal).  Because petitioner "was represented by counsel on appeal," he "was not entitled to a personal copy of the transcript of [the] trial for appeal purposes," *Clarke v. Warren*, No. 05-60151, 2011 WL 2580686, at *21 (E.D. Mich. June 29, 2011) (citing *Gay v. Watkins*, 579 F. Supp. 1019, 1022 (E.D. Pa. 1984)), and counsel's alleged failure to provide petitioner a copy of the

51

transcript did not amount to ineffective assistance of counsel. *See Lee v. Wilson*, No. 1:04 CV 2169, 2007 WL 2571954, at *17-*18 (N.D. Ohio Aug. 31, 2007); *United States v. Ilodi*, 982 F. Supp. 1046, 1048-49 (D. Md. 1997). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this ineffective assistance of appellate counsel claim.

J.    *Recommendation Regarding Certificate of Appealability*

1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893

52

n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability.  The eyewitness testimony regarding the circumstances of the shooting, if believed by the jury, provided more than sufficient evidence to prove that petitioner acted with malice aforethought and that he did not act under the passion of an adequate provocation.  Thus, the resolution of petitioner's sufficiency of the evidence claim is not reasonably debatable.  Because, as explained above, the excluded

evidence would not have provided any evidence in support of petitioner's adequate provocation or self-defense theories, the conclusion that petitioner was not denied his right to present a defense by the exclusion of this evidence is not reasonably debatable.  Likewise, because petitioner was afforded the opportunity to confront the witnesses against him, and because there is no evidence that the video was destroyed by the police in bad faith, the resolution of petitioner's claims relating to the video is not reasonably debatable.  With respect to petitioner's sentencing claims, it is clear that petitioner's challenge to the guidelines scoring is not cognizable, and that in any event OV-6 was correctly scored based on accurate information.  Thus, the resolution of petitioner's sentencing claim is not reasonably debatable.  Finally, the resolution of petitioner's ineffective assistance of counsel claims is not reasonably debatable, for the reasons explained above.  Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

K.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*,

932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Date: April 2, 2014                                    s/Paul J. Komives_____
                                                       PAUL J. KOMIVES
                                                       UNITED STATES MAGISTRATE JUDGE


<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on April 2, 2014.


                                                       s/ Kay Doaks_____
                                                       Case Manager